755 F.2d 993
 79 A.L.R.Fed. 157
 GROCERY MANUFACTURERS OF AMERICA, INC., a Delaware
Corporation, Plaintiff-Appellee Cross-Appellant,
v.
Joseph GERACE, Commissioner, New York Department of
Agriculture and Markets, and the New York
Department of Agriculture and Markets,
Defendants-Appellants Cross-Appellees,
John R. Block, as Secretary of Agriculture of the United
States and the Department of Agriculture of the United
States, Margaret M. Heckler, as Secretary of Health and
Human Services of the United States, and the Department of
Health and Human Services of the United States, Additional
Defendants on Counterclaim-Appellees.
 Nos. 177, 388, Dockets 84-6141, 84-6149.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 26, 1984.
Decided Feb. 14, 1985.
 
 Thomas G. Conway, N.Y., Dept. of Agriculture and Markets, Albany, N.Y. (Robert Abrams, Atty. Gen., of the State of N.Y., New York City, of counsel), for defendant-appellant cross-appellee New York Dept. of Agriculture and Markets.
 Franklin H. Stone, Asst. U.S. Atty., S.D. of N.Y., New York City (Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., Jane E. Booth, Asst. U.S. Atty., S.D. of N.Y., Beverly Sherman Nash, U.S. Dept. of Justice, Frederick H. Degnan, Food and Drug Admin., Thomas D. Edmundson, U.S. Dept. of Agriculture, Washington, D.C., of counsel), for defendants on counterclaim-appellees Block and Heckler.
 George M. Burditt, Chicago, Ill. (Robert G. Epsteen, Burditt, Bowles & Radzius, Ltd., Chicago, Ill., Sheldon Oliensis, Richard A. DeSevo, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for plaintiff-appellee cross-appellant Grocery Mfrs. of America.
 Before FRIENDLY, MESKILL and PIERCE, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from a judgment entered in the United States District Court for the Southern District of New York, Duffy, J., granting the motion of plaintiff-appellee Grocery Manufacturers of America (GMA) for preliminary and permanent injunctive relief. The district court, in a decision reported at 581 F.Supp. 658 (S.D.N.Y.1984), enjoined the enforcement of N.Y.Agric. & Mkts.Law Sec. 63 (section 63), which it found invalid on federal preemption and Commerce Clause grounds.
 
 
 2
 We affirm in part and reverse in part.
 
 BACKGROUND
 
 3
 This litigation involves state and federal regulatory schemes that require descriptive labeling of cheese alternatives: products composed wholly or partly of food that looks, smells and tastes like cheese, but is not, in fact, cheese. The major focus of the dispute concerns the use and meaning of the modifier "imitation" as applied to these products. A brief discussion of cheese-making is in order.
 
 
 4
 Real cheese is made from milk with its milkfat content intact. Cheese alternatives may be made in two ways. One method begins with either milk from which the milkfat has been removed or casein, natural milk protein extracted from milk. The altered milk or casein is then combined with vegetable oil, which substitutes for milkfat. This type of alternative cheese is lower in calories and cholesterol than real cheese. It sells at prices fifty to sixty percent lower than real cheese. The other type of alternative cheese is chemically similar to real cheese but is made wholly or in part with substitute dairy products. This is presumably even less expensive to manufacture than the former. Vitamins and minerals may be added to raise the nutritional level of alternative cheese. Record of Administrative Rulemaking Proceedings in the Adoption of Imitation Cheese Labeling Regulations (before the New York Department of Agriculture and Markets), Record Doc. # 6 at 152-60.
 
 
 5
 Alleging that New York's imitation cheese law was in conflict with federal labeling requirements and with the Commerce Clause, GMA commenced this litigation with a complaint requesting injunctive and declarative relief against defendants-appellants New York Department of Agriculture and Markets and the department's Commissioner, Joseph Gerace (collectively New York). New York counterclaimed and included as additional defendants the United States Department of Agriculture (USDA); the United States Department of Health and Human Services (HHS), the bureaucratic parent of the Food and Drug Administration (FDA); and the respective department secretaries. The counterclaim sought to have 21 C.F.R. Sec. 101.3 (1984), the federal regulation that defines the term imitation for purposes of food package labeling, declared invalid.
 
 
 6
 The text of New York's section 63, enacted in 1982, is set out in the margin.[1] Briefly, it requires that alternative cheese products feature labels that display prominently the descriptive term "imitation." It also directs that anyone who sells prepared foods containing cheese alternatives, whether for carry out or for consumption on the premises, must display a sign that discloses in three inch letters those foods that contain "imitation cheese." Further, it provides that restaurant menus must append the words "contains imitation cheese" to the item designation of any offering containing alternative cheese. And, finally, alternative cheese products available for use by customers on the premises--as, for example, something resembling grated parmesan--must be conspicuously labeled as "imitation cheese."
 
 
 7
 Section 63 does not define imitation. The regulations promulgated pursuant to the statute define "imitation cheese" as any food simulating "cheese" as described or standardized by regulation but failing to meet that description or standard. N.Y.Admin.Code tit. 1, Sec. 18.1(c). Neither the statute nor any of its regulations is concerned with nutritional values.
 
 
 8
 The federal scheme implicated here, which establishes the requisite information content of package labels for foods shipped in interstate commerce, involves three federal statutes and two federal agencies. Food labeling generally is governed on the federal level by the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. Sec. 301 et seq. (1982), and its regulations, which come under the administrative aegis of the FDA. The FDCA does not contain any express preemption language.
 
 
 9
 The labeling of meat and poultry products shipped in interstate commerce is specifically controlled by the Federal Meat Inspection Act (FMIA), 21 U.S.C. Sec. 601 et seq. (1982), and the Poultry Products Inspection Act (PPIA), 21 U.S.C. Sec. 451 et seq. (1982), and their respective regulations, 9 C.F.R. Sec. 317 et seq. (1984). The FMIA and the PPIA are administered by the USDA. Both statutes contain substantially identical preemption language which permits some concurrent state enforcement but prohibits state "[m]arking, labeling, packaging, or ingredient requirements in addition to, or different than, those" mandated by federal law. 21 U.S.C. Sec. 678 (FMIA); see also 21 U.S.C. Sec. 467e (PPIA).
 
 
 10
 The FDCA specifically prohibits, among other things, misbranded foods. Under the FDCA, a food is misbranded if it is sold under the name of any other food, 21 U.S.C. Sec. 343(b), or if it purports to be a food, such as cheese, for which a standard of identity has been prescribed by regulation and it does not conform exactly to that standard, 21 U.S.C. Sec. 343(g). In addition, a food that "is an imitation of another food" is misbranded unless its label contains the word "imitation" in prominent letters immediately preceding the name of the food imitated. 21 U.S.C. Sec. 343(c).
 
 
 11
 The FDCA does not define imitation; that task was accomplished by regulation in 1973. An imitation food is defined as a food which "is a substitute for and resembles another food but is nutritionally inferior to that food." 21 C.F.R. Sec. 101.3(e)(1). Nutritional inferiority is determined by comparing the percentages of so-called "essential nutrients" in the substitute to those in the food for which it substitutes. 21 C.F.R. Sec. 101.3(e)(4). The essential nutrients are protein and the nineteen vitamins and minerals for which the federal government has established recommended daily allowances (U.S. RDAs). Id.; Sec. 101.9(c)(7)(iv). Basically, if the substitute contains less of any essential nutrient present to a measurable degree in the food substituted for, the substitute must be labeled with the word "imitation."
 
 
 12
 A nutritionally equivalent or superior substitute food would be misbranded under federal law if it was labeled with the term "imitation."[2] Such foods must be identified by an appropriate common or usual name or, if none exists, a descriptive term.[3] The fact that such foods are substitute foods would thus be evident from the foods' labels, albeit less so than if the word "imitation" was used.
 
 
 13
 The FMIA and the PPIA contain misbranding provisions essentially identical to the FDCA's. Compare 21 U.S.C. Sec. 453(h) (PPIA) and Sec. 601(n) (FMIA) with 21 U.S.C. Sec. 343 (FDCA). Unlike the FDCA, both the PPIA and the FMIA, to prevent misbranding, require that all proposed labels be reviewed and approved by USDA agents prior to use. 21 U.S.C. Sec. 457(c) & (d) (PPIA); Sec. 607(d) & (e) (FMIA). Neither the text of nor the regulations under either the FMIA or the PPIA define imitation. However, the USDA avers that it has adopted the FDA's definition.
 
 
 14
 Thus federal labeling requirements for alternative cheese products and for meat and poultry products containing cheese alternatives are uniform. If the product is nutritionally inferior to the food it resembles, it must be labeled "imitation." If, however, it is nutritionally equivalent or superior to its model, it would be misbranded if it was labeled "imitation."
 
 
 15
 In the court below, the parties agreed and the district judge found that there were no unresolved material issues of fact. 581 F.Supp. at 661. The judge therefore deemed summary judgment as to GMA's motion for preliminary and permanent injunctive relief appropriate. Id. Accordingly, the court held that New York's labeling requirements as applied to alternative cheese were preempted by the FDCA because the federal requirements, as applied in compliance with the FDA's definition of imitation, and the state requirements were in actual conflict. Further, it held that the state labeling requirements as applied to meat and poultry products containing alternative cheese were preempted by the FMIA and the PPIA because the USDA's adoption of the FDA's definition of imitation created actual conflict between the state and federal schemes and, also, because of the express preemption language in the federal statutes. Finally, the district court held that the sign, menu and container provisions were invalid because they placed an undue burden on interstate commerce in violation of the Commerce Clause.
 
 
 16
 On appeal, New York challenges all three of the district court's conclusions. It argues that the state labeling provisions are not preempted by the FDCA because the federal regulation defining imitation violates the meaning and purpose of the FDCA and is therefore invalid. Invalidation of the regulation, of course, would vitiate the actual conflict between the state and federal schemes. New York also maintains that even if the definition is valid under the FDCA, the USDA's adoption of the definition was procedurally defective. Thus, New York reasons, the state statute is not in conflict with either the FMIA or the PPIA. Further, New York claims that the requirements of the state statute fall outside the reach of the preemption provisions of the FMIA and the PPIA. And finally, New York contends that the sign, menu and container provisions do not violate the Commerce Clause.DISCUSSION
 
 I. Federal Preemption
 A. Generally
 
 17
 The preemption doctrine is rooted in the Supremacy Clause of the United States Constitution, Art. VI, cl. 2. Its application compels judicial divination of congressional intent. Preemption is mandated in two general contexts: when a state legislates in a field that Congress intended to occupy totally and when the state and federal laws actually conflict.
 
 
 18
 Any state law intruding upon an area that Congress intended to control exclusively is preempted, "whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Absent explicit preemption language, congressional intent to occupy the field regulated may nevertheless be inferred on the basis of the pervasiveness of the federal scheme, the dominance of the federal interest involved or because the federal statute in combination with the nature of its directives reveals the purpose to preclude state action. Fidelity Federal Savings & Loan Association v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).
 
 
 19
 "Even where Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law." Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). An actual conflict exists "when it is impossible to comply with both state and federal law, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, Hines v. Davidowitz, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941)." Silkwood v. Kerr-McGee Corp., --- U.S. ----, ----, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984).
 
 
 20
 Moreover, preemption is compelled not only when the conflict involves a federal statute, but also when it involves valid federal regulations. Provided that they are reasonable exercises of an agency's duly authorized discretion and not in conflict with congressional intent, United States v. Shimer, 367 U.S. 374, 381-82, 81 S.Ct. 1554, 1559-60, 6 L.Ed.2d 908 (1961), "[f]ederal regulations have no less pre-emptive effect than federal statutes." Fidelity Federal Savings & Loan, 458 U.S. at 153, 102 S.Ct. at 3022; accord Blum v. Bacon, 457 U.S. 132, 145-46, 102 S.Ct. 2355, 2363-64, 72 L.Ed.2d 728 (1982).
 
 B. The FDCA
 
 21
 The preemptive effect of the FDCA depends entirely on whether the FDA's definition of imitation is valid and therefore entitled to our deference. Characterizing 21 C.F.R. Sec. 101.3(e) as an attempt to administratively amend the FDCA, New York argues that we should disregard the regulation and give the word imitation its ordinary meaning.
 
 
 22
 New York's challenge to the FDA regulation is grounded in the language, legislative history and, most particularly, the pre-1973 (i.e., prior to the promulgation of 21 C.F.R. Sec. 101.3(e)) judicial construction of the FDCA and its predecessor statutes. The fulcrum of the state's argument is the United States Supreme Court decision in 62 Cases of Jam v. United States, 340 U.S. 593, 71 S.Ct. 515, 95 L.Ed. 566 (1951). That litigation involved a product labeled "Delicious Brand Imitation Jam" which the government claimed was misbranded because it resembled fruit jam but contained less than the federally standardized amount of fruit. The controversy actually involved a perceived conflict between the FDCA subsection deeming a food misbranded if it substituted for and resembled another food but was not labeled "imitation" and the subsection deeming a food misbranded if it purported to be a food that had been standardized by regulation. In concluding that the product purported to be not fruit jam but imitation jam and, therefore, that it was not misbranded, the Court reasoned that "the ordinary meaning of the statute" should control. 340 U.S. at 600, 71 S.Ct. at 520.
 
 
 23
 The 62 Cases of Jam Court discussed and distinguished an earlier Supreme Court case relied on by New York and also decided under the FDCA, Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724 (1943). 62 Cases of Jam, 340 U.S. at 598-99, 71 S.Ct. at 519. In upholding the government's contention that a food was misbranded even though its label disclosed the presence of a nondeleterious substance that was not a standard ingredient, the Quaker Oats Court explained that the purposes of the FDCA went beyond mere prohibition of false and misleading labeling. Such prohibition alone could not
 
 
 24
 protect the consumer from "economic adulteration," by which less expensive ingredients were substituted, or the proportion of more expensive ingredients diminished, so as to make the product, although not in itself deleterious, inferior to that which the consumer expected to receive when purchasing a product with the name under which it was sold.
 
 
 25
 318 U.S. at 230, 63 S.Ct. at 596. To guard the integrity of food products, the act authorized promulgation of standards of identity, requiring "informative labeling only where no such standard had been promulgated, where the food did not purport to comply with a standard, or where the regulations permitted optional ingredients and required their mention on the label." Id.
 
 
 26
 New York also refers us to United States v. 651 Cases, More or Less, of Chocolate Chil-Zert, 114 F.Supp. 430 (N.D.N.Y.1953) (Chil-Zert ), which, drawing on the Supreme Court precedents, attempted to flesh out the judicial definition of imitation. "The word connotes inferiority in the sense that [the product] is cheapened by the substitution of ingredients[;]" the result is "something less than the genuine article." Id. at 432 (citations omitted).
 
 
 27
 New York correctly notes that the FDA's regulatory definition of imitation is at odds with the judicial gloss placed on the term. Consequently, the state avers, we should disregard the definition and follow the reasoning of Swift & Co. v. Walkley, 369 F.Supp. 1198 (S.D.N.Y.1973), decided under the FMIA. The Swift Court acknowledged that the USDA, in approving a label for a frankfurter-like product that did not contain the word "imitation," had relied on the findings of the White House Conference on Food, Nutrition and Health Final Report 120 (1969), J.App. at 139 (White House Report ), particularly that "[c]onsumers are reluctant to purchase products labelled 'imitation' even though the products are very good and highly nutritious." 369 F.Supp. at 1200 (quoting USDA official's affidavit). Nevertheless, the court rejected the USDA's position and upheld the state's ban on the sale of the product because, lacking the modifying "imitation frankfurters," the product was misbranded.
 
 
 28
 If we were addressing the validity of the FDA regulation in or about 1973, the year of its promulgation, we might be inclined to reject it. But the regulation has been in effect for eleven years. Congress' failure during this period to alter the relevant statutory language or to otherwise condemn the regulatory definition, while not a failsafe guide, allows us at least to infer that it has acquiesced in the FDA's construction. See, e.g., Haig v. Agee, 453 U.S. 280, 300, 101 S.Ct. 2766, 2778, 69 L.Ed.2d 640 (1981); United States v. Rutherford, 442 U.S. 544, 554 & n. 10, 99 S.Ct. 2470, 2470 & n. 10, 61 L.Ed.2d 68 (1979); Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965); Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 313, 53 S.Ct. 350, 357, 77 L.Ed. 796 (1933); Costanzo v. Tillinghast, 287 U.S. 341, 345, 53 S.Ct. 152, 153, 77 L.Ed. 350 (1932); but see SEC v. Sloan, 436 U.S. 103, 119-21, 98 S.Ct. 1702, 1712-13, 56 L.Ed.2d 148 (1978). Moreover, the two courts of appeals that have considered the regulation have upheld its validity. National Milk Producers Federation v. Harris, 653 F.2d 339 (8th Cir.1981); Federation of Homemakers v. Schmidt, 539 F.2d 740 (D.C.Cir.1976).
 
 
 29
 We could scarcely improve on the D.C. Circuit's perspicacious decision in Federation of Homemakers sustaining the FDA's definition against a challenge brought by a national consumer group. Addressing arguments similar to those raised by New York, the court explained that the earlier and undeniably reasonable judicial construction of imitation did not "prevent the promulgation of an equally reasonable definition by the agency charged with administering the [FDCA]." 539 F.2d at 743. We concur with that court; "our deference to the enforcing agency's interpretation limits our review to determining only whether the regulation violates the language of the statute or is arbitrary and capricious." Id. The FDA's regulation furthers the twin goals of "better informing consumers so that they may exercise a knowledgeable choice of differing foods within general categories" and "encouraging manufacture of nutritional food products;" it is both reasonable and within the ambit of the agency's discretion. Id. at 744; accord White House Report at 120, J.App. at 139.
 
 
 30
 Unless contrary to the indications of the statute itself, see SEC v. Sloan, 436 U.S. at 117-19, 98 S.Ct. at 1711-12, the construction and application of a statute by the agency charged with its administration is entitled to substantial deference. Blum v. Bacon, 457 U.S. at 141, 102 S.Ct. at 2361; United States v. Rutherford, 442 U.S. at 553, 99 S.Ct. at 2475; Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The FDA's definition of imitation is entitled to our deference.
 
 
 31
 Thus, as applied to alternative cheese, the New York labeling scheme is in direct conflict with its federal counterpart. Including the term imitation on the label of a nutritionally superior alternative cheese in order to comply with New York law, would render the product misbranded under federal law. Compliance with both the state and federal requirements is impossible. To the extent that it attempts to regulate the labeling of alternative cheese, the New York law is preempted.
 
 C. The FMIA and the PPIA
 
 32
 Whether the New York law as applied to meat and poultry products that contain alternative cheese is also preempted requires us to determine whether the reach of the preemption provisions of the FMIA and the PPIA extends to the New York labeling requirements. This inquiry requires us to decide, also, whether the USDA's adoption of the FDA's regulatory definition of imitation was valid.
 
 
 33
 New York argues that the adoption was improper because it was not in accordance with the rulemaking provisions of the Administrative Procedure Act, 5 U.S.C. Sec. 551 et seq. (1982). The district court determined, and the federal parties agree, "that the USDA's imitation food policy is more akin to a statement of general policy or an interpretive rule than to a rule which requires formal notice and comment proceedings." 581 F.Supp. at 665. The federal agencies also claim that the USDA's action could be correctly characterized as an express adoption of a standing policy through adjudication.
 
 
 34
 It is well established that an agency may adopt prospective rules of general effect through either rulemaking or adjudication; the choice of method rests within the discretion of the agency. E.g., NAACP v. FPC, 425 U.S. 662, 668, 96 S.Ct. 1806, 1810, 48 L.Ed.2d 284 (1976); NLRB v. Bell Aerospace Co., 416 U.S. 267, 290-95, 94 S.Ct. 1757, 1769-72, 40 L.Ed.2d 134 (1974); SEC v. Chenery Corp., 332 U.S. 194, 202-03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); New York State Commission on Cable Television v. FCC, 669 F.2d 58, 62 n. 9 (2d Cir.1982). In support of its claim of adoption through adjudication, the USDA cites In re Castleberry's Food Co., 40 Agric. Dec. 1262 (1981), a USDA adjudicative proceeding under the FMIA, which expressly adopted what it identified as agency practice: use of the FDA definition of imitation in the case-by-case approval of food labels. Id. at 1277-78. Indeed, as the court in Swift & Co. v. Walkley, 369 F.Supp. at 1200, indicated, the agency had begun narrowing the application of the term "imitation" as early as 1970, just after the issuance of the White House Report. Moreover, formal notice and comment rulemaking procedures concerning the practice were initiated on or about August 5, 1983. 48 Fed.Reg. 35,654 (1983). The initiating notice explained that
 
 
 35
 [t]he proposed disclosure requirement for substitute and imitation cheese ingredients would not affect current requirements for "imitation" labeling. Thus, for example, in addition to the disclosure statement concerning its cheese content, any standardized meat product whose required ingredients include "cheese" would still be required to bear "imitation" labeling, if the use of imitation cheese caused the product to be nutritionally inferior to the standardized product.
 
 
 36
 Id. at 35,658.
 
 
 37
 Even if it should be classified as an interpretive rule or a statement of general policy, rather than as a formal rule adopted via adjudication, the USDA's practice of following the FDA definition of imitation when reviewing meat and poultry product labels is valid. The distinctions between formal rules and interpretive rules or general statements of policy are often vague. Noel v. Chapman, 508 F.2d 1023, 1029-30 (2d Cir.), cert. denied, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975); Pacific Gas & Electric Co. v. FPC, 506 F.2d 33, 37-40 (D.C.Cir.1974). But we need not explore the nuances. If the USDA's practice is merely interpretive, it is a reasonable interpretation and therefore entitled to judicial respect. Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); National Nutritional Foods Association v. Weinberger, 512 F.2d 688, 696 (2d Cir.), cert. denied, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). And, while we recognize that we are not bound by interpretive rules, American Postal Workers Union v. United States Postal Service, 707 F.2d 548, 560 (D.C.Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984); Board of Education v. Harris, 622 F.2d 599, 612-13 (2d Cir.1979), cert. denied, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981), we discern no reason to reject the USDA's longstanding interpretation of the FMIA and PPIA misbranding provisions. Cf. United States v. Clark, 454 U.S. 555, 565, 102 S.Ct. 805, 811, 70 L.Ed.2d 768 (1982) ("Although not determinative, the construction of a statute by those charged with its administration is entitled to great deference, particularly when that interpretation has been followed consistently over a long period of time.") Consequently, the New York requirements are "different from" the federal requirements, as administered, and they are therefore preempted.
 
 
 38
 Notwithstanding the conflict created by its use of "imitation," the New York law imposes other labeling requirements that are "in addition to[ ] or different than" the federal requirements. The preemption language of the FMIA, essentially identical to that in the PPIA, was addressed by the Supreme Court in Jones v. Rath Packing Co., 430 U.S. at 528-32, 97 S.Ct. at 1311-13. The Court had before it the federal and California standards of accuracy for net weight labeling. California's inspection sampling technique implicitly permitted the inevitable slight deviations resulting from the manufacturing process. But it did not allow for weight loss "resulting from moisture loss during the course of good distribution practice." Id. at 531, 97 S.Ct. at 1312. In contrast, the USDA had interpreted the FMIA to permit reasonable variations, including such moisture loss. Id. at 529, 97 S.Ct. at 1311. Thus, the Court held that the California regulations were explicitly preempted by the FMIA. Id. at 532, 97 S.Ct. at 1313.
 
 
 39
 Analogously, New York's section 63 mandates the precise size of the letters in and relative location of the word "imitation" on package labels. These requirements do not comport exactly with the federal specifications.[4] Therefore, the state requirements are preempted.
 
 II. Commerce Clause
 
 40
 Our preemption holdings make it unnecessary for us to determine whether the New York labeling provisions are invalid under the Commerce Clause as well. Accordingly, we direct our Commerce Clause analysis only to the New York sign, menu and container provisions, subsections 3, 4 and 5 of section 63.[5]
 
 
 41
 The Supreme Court has mapped our course quite clearly:
 
 
 42
 Where [a state] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. Huron Cement Co. v. Detroit, 362 U.S. 440, 443 [80 S.Ct. 813, 815, 4 L.Ed.2d 852]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
 
 
 43
 Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).
 
 
 44
 The district court correctly determined that the New York law regulates evenhandedly. 581 F.Supp. at 670. The state requirements do not distinguish between alternative cheese products from in-state manufacturers and those from out-of-state manufacturers. And, to the extent that they indirectly advantage the dairy industry, that effect is not necessarily limited to in-state dairy producers.[6]
 
 
 45
 Further, the local interest which the New York scheme was designed to protect is a legitimate one. States have traditionally acted to protect consumers by regulating foods produced and/or marketed within their borders. E.g., Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963). Under federal law, foods packaged for wholesale or retail marketing are labeled to indicate that they fit into one of three categories: real cheese, alternative cheese that meets or exceeds federal nutritional guidelines or alternative cheese that falls below nutritional guidelines. New York has determined that patrons of food service establishments and restaurants--heretofore wholly uninformed as to the composition of any cheese-like substance served to them--are entitled to know at least whether they are buying real cheese or a cheese alternative. The record shows that health and nutrition professionals strongly disagree about the intrinsic value of the federal nutritional guidelines applied to alternative cheese products. See, e.g., In re Considering the Adoption of Regulations Relating to Labeling and Notification Required Prior to the Serving of Imitation Cheese, Imitation Cheese Food and Products Containing Imitation Cheese or Imitation Cheese Food, J.App. at 45, 50 (rejecting federal government's nutritional equivalency arguments); Record of Administrative Rulemaking Proceedings in the Adoption of Imitation Cheese Labeling Regulations, vol. 2 at 557-59, Record Doc. # 7 at 557-59 (reproducing Kotula & Briggs, "The Nutritional Aspects of Imitation and Substitute Foods," 46 Nutrition News, no. 1 at 1-3 (Feb.1983), which rejects the premise of the federal government's nutritional equivalency arguments). The very existence of this controversy persuades us that New York's nutritional concerns are not unreasonable. In addition to promoting those concerns, the state requirements are intended to prevent deception and unfair competition, to promote honesty and fair dealing and to permit consumers to clearly discern whether they are buying real cheese or not. We believe that the sign, menu and container provisions effectuate a legitimate, local public purpose.
 
 
 46
 The final step of our Commerce Clause analysis requires us to balance the local interest served against the burden imposed on interstate commerce by the disputed sections. Interestingly, the federal government did not join in GMA's challenge to the sign, menu and container provisions. Neither did the operators of any restaurants or food service establishments, though they are surely the persons most directly affected by these provisions.
 
 
 47
 The only evidence in the record establishing a connection between the provisions and interstate commerce comprises three affidavits.[7] The affidavits, at bottom, claim but a single impact on commerce: restaurants and food service establishments will discontinue the use of alternative cheese products rather than comply with the sign, menu and container provisions. Of those filed, only the affidavit of Olindo DiFrancesco, President of Olindo's Food, Inc., really supports the alleged purchasing shift, J.App. at 401; the others are merely conclusory, see affidavit of George W. Cawman, J.App. at 201; affidavit of Thomas Brennan, J.App. at 417. Olindo's Food, Inc. distributes foods, including cheese and cheese alternatives to restaurants, pizza parlors and grocery stores. According to DiFrancesco, prior to passage of the New York law, most of the pizzerias that purchased from Olindo's Food used a mozzarella substitute. After the law's passage, however, sales of the cheese alternative began to decline. Naming two specific customers (representing thirty-seven pizza parlors) who discontinued such purchases, DiFrancesco averred that his sales of cheese alternatives have dropped from 12,000 to 2,000 pounds per week or approximately $7,500 per week. His losses have not been offset by increases in sales of real mozzarella. Ironically, Olindo's Food is located in New York State.
 
 
 48
 The facts are not disputed in this case. Thus, we accept that sales of cheese alternatives to food service establishments have declined. But this decline is susceptible of at least two interpretations. One is that the sign, menu and container requirements are so onerous that food service establishments and restaurants are willing to use real cheese and thus forego the advantages of cheese substitutes, economic and otherwise, rather than comply. Equally probable, however, is that food service establishment operators and restauranteurs will not use less expensive cheese alternatives in place of real cheese if they have to disclose that use to customers.
 
 
 49
 GMA relies substantially on American Meat Institute v. Ball, 550 F.Supp. 285 (W.D.Mich.1982), aff'd on other grounds sub nom. American Meat Institute v. Pridgeon, 724 F.2d 45 (6th Cir.1984), for its Commerce Clause argument. That decision struck down a Michigan law that required federally inspected meats not in compliance with Michigan ingredient requirements to be accompanied by a prominent placard stating, in part, "The following products do not meet Michigan's high meat ingredient standards but do meet lower federal standards." Id. at 286 n. 1. However, in that case the court found that the federal standards, in many respects, were actually higher than Michigan's and that the required placard was thus not only misleading but wrong. Accordingly, it held that the state law did not promote a legitimate state interest and, therefore, that it violated the Commerce Clause.
 
 
 50
 The New York sign, menu and container provisions do not produce such an inaccurate or misleading result that they fail to serve a legitimate state purpose. And although complying with the sign posting requirement will certainly not enhance the decor of most restaurants, that negative is not a violation of the Commerce Clause. Indeed, consumers seeking low cholesterol foods may be benefited by the prominence of the signs. The disputed provisions here are the result of legislative choices. The arguments against the provisions "relate[ ] to the wisdom of the statute, not to its burden on commerce." Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 128, 98 S.Ct. 2207, 2215, 57 L.Ed.2d 91 (1978). That wisdom is better reconsidered in Albany than Foley Square.
 
 
 51
 A state regulatory scheme "is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry. Only if the burden on interstate commerce clearly outweighs the State's legitimate purposes does such a regulation violate the Commerce Clause." Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 474, 101 S.Ct. 715, 729, 66 L.Ed.2d 659 (1981) (emphasis added). The disputed provisions place a relatively minor burden on commerce and advance an important state interest. We are not persuaded that the use of a term other than "imitation" or the posting of smaller signs would both serve the local interest and have a lesser effect on commerce. We therefore reverse the district court and hold that the sign, menu and container provisions, subsections 3, 4 and 5 of section 63, do not violate the Commerce Clause.
 
 
 52
 We draw additional support for our conclusion from the language of 21 U.S.C. Sec. 25 (1982). That section provides, in part, that "imitation cheese[ ] or any substance in the semblance of ... cheese not the usual product of the dairy and not made exclusively of pure and unadulterated milk or cream, transported into any State ... and remaining therein for use, consumption, sale, or storage" is subject to the laws of that state. Enacted to override judicial decisions that prevented states from prohibiting sales of oleomargarine, the statute "indicates a Congressional purpose not to hinder the free exercise of state power, except as it may be inconsistent with the federal legislation." Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 161, 62 S.Ct. 491, 499, 86 L.Ed. 754 (1942). The sign, menu and container provisions are not inconsistent with federal legislation governing cheese alternatives because they address an area in which Congress has not acted. The expansiveness of 21 U.S.C. Sec. 25 thus confers upon those provisions, if not a shield, at least a sturdy buffer against the Commerce Clause.
 
 III. Equal Protection
 
 53
 GMA also alleged in its complaint that the sign, menu and container provisions violated the Equal Protection Clauses of the federal, U.S. Const.amend. XIV, Sec. 1, and state, N.Y. Const.art. 1, Sec. 11, constitutions. Because the district court held that the provisions were void under the Commerce Clause, it did not reach the equal protection issue. We find GMA's claim wholly unpersuasive.
 
 
 54
 As applied to this type of legislation, the federal and state guarantees of equal protection prohibit statutory classifications that embody distinctions not rationally related to the object of the legislation. Barry v. Barchi, 443 U.S. 55, 67, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365 (1979); New York v. Acme Markets, 37 N.Y.2d 326, 331-32, 372 N.Y.S.2d 590, 595, 334 N.E.2d 555, 558 (1975). We have already discussed the legitimate interest advanced by the sign, menu and container provisions. We have stated our belief that those requirements, which distinguish between producers of real cheese and manufacturers of cheese alternatives, reasonably address New York's legitimate concerns. Accordingly, we conclude that the provisions establish classifications rationally related to the state's purpose and thus do not violate equal protection.IV. Attorney's Fees
 
 
 55
 GMA also argues that, as a prevailing party on a 42 U.S.C. Sec. 1983 (1982) claim, it is entitled to reasonable attorney's fees as authorized by 42 U.S.C. Sec. 1988 (1982). We need not determine whether this litigation is even remotely related to the type in which Congress intended that attorney's fees be awarded. Our decision is mandated by the language of 42 U.S.C. Sec. 1988, which leaves the decision whether to award fees solely to the discretion of the trial judge. Judge Duffy specifically denied GMA's request. 581 F.Supp. at 672. We see no abuse of discretion here.
 
 CONCLUSION
 
 56
 To the extent that it held the labeling provisions of the New York statute, N.Y.Agric. & Mkts. Law Sec. 63(1) & (2), and their accompanying regulations in violation of the Supremacy Clause, the decision of the district court is affirmed. Insofar as it held that the sign, menu and container provisions, N.Y.Agric. & Mkts. Law Sec. 63(3), (4) & (5), and their accompanying regulations in violation of the Commerce Clause, it is reversed. We affirm the denial of attorney's fees.
 
 
 
 [1]
 Section 63, N.Y. Agric. & Mkts. Law, provides in its entirety:
 
 
 [1]
 Whenever the brand name or product designation of imitation cheese or imitation cheese food appears on a package, the brand name or product designation, whichever is larger, shall be immediately preceded, without intervening printed or graphic material by the word imitation and the name of the food imitated, in letters of the same color and on the same contrasting background and of equal size as the brand name or product designation, whichever is larger
 
 
 [2]
 On the label of any product containing imitation cheese or imitation cheese food, the product designation shall be immediately preceded or followed by the words "contains imitation cheese" or "contains imitation cheese food" whichever is appropriate, in letters of the same color and on the same contrasting background and of equal size as the product designation
 
 
 [3]
 Whenever imitation cheese or imitation cheese food is used in a product which is offered for sale for carry out or on premises consumption, a sign shall be prominently posted at the place of sale which states the product designation of the food followed immediately by the words "contains imitation cheese" or "contains imitation cheese food," whichever is appropriate. The letters on such sign shall be in block letters at least three inches in height and on a contrasting background which can be easily read by consumers under normal conditions of purchase
 
 
 [4]
 Whenever any product which contains imitation cheese or imitation cheese food product is offered for sale on the menu of any service food establishment, the product designation on such menu shall be immediately followed by the words "contains imitation cheese" or "contains imitation cheese food", whichever is appropriate, in letters of equal size and on a contrasting background
 
 
 [5]
 Whenever any imitation cheese or imitation cheese food product is placed on the tables or otherwise made available for use by customers in any service food establishment, the container of such product shall be conspicuously labeled "imitation cheese", or "imitation cheese food product"
 
 
 [6]
 The commissioner shall promulgate such rules and regulations as are necessary and appropriate to carry out the provisions of this section, including specific identification of imitation cheese and imitation cheese food
 
 
 [2]
 This outcome could be modified by the exercise of 21 C.F.R. Sec. 101.3(e)(4)(iii):
 If the Commissioner concludes that a food is a substitute for and resembles another food but is inferior to the food imitated for reasons other than those set forth in this paragraph, he may propose appropriate revisions to this regulation or he may propose a separate regulation governing the particular food.
 
 
 [3]
 Subsection (2) of 21 C.F.R. Sec. 101.3(e) provides:
 A food that is a substitute for and resembles another food shall not be deemed to be an imitation provided it meets each of the following requirements:
 (i) It is not nutritionally inferior to the food for which it substitutes and which it resembles.
 (ii) Its label bears a common or usual name that complies with the provisions of Sec. 102.5 of this chapter and that is not false or misleading, or in the absence of an existing common or usual name, an appropriately descriptive term that is not false or misleading. The label may, in addition, bear a fanciful name which is not false or misleading.
 Subsection (3) further restricts the ambit of "imitation: "
 A food for which a common or usual name is established by regulation (e.g., in a standard of identity pursuant to section 401 of the act, in a common or usual name regulation pursuant to Part 102 of this chapter, or in a regulation establishing a nutritional quality guideline pursuant to Part 104 of this chapter), and which complies with all of the applicable requirements of such regulation(s), shall not be deemed to be an imitation.
 
 
 [4]
 See section 63(1), supra note 1. The PPIA misbranding section, 21 U.S.C. Sec. 453(h)(3), and the FMIA misbranding provision, 21 U.S.C. Sec. 601(n)(3), both provide that a product is misbranded
 if it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word "imitation" and immediately thereafter, the name of the food imitated.
 
 
 [5]
 Similarly, we do not address GMA's claim that the labeling provisions violate the Equal Protection Clause
 
 
 [6]
 Some cheese alternatives contain a percentage of real cheese; many are made with dairy products. Thus, any disadvantage to the alternative cheese product manufacturers may have a similar impact on at least some segment of the New York dairy industry
 
 
 [7]
 The district court erroneously determined that interstate commerce would somehow be burdened because restauranteurs and other food service operators would be unable to determine whether items that they used in food preparation would require sign, menu or container disclosure. But because those items would presumably be labeled in accordance with federal requirements, the label would show that the item was not real cheese