SEARS, ROEBUCK AND CO., Allstate Insurance Company, Allstate Life Insurance Company, Allstate Enterprises Inc., Coldwell, Banker & Company, and Dean Witter Reynolds, Inc., Plaintiffs

v.

Howard B. BROWN, Acting Commissioner of the Department of Banking of the State of Connecticut, Defendant,

and

The Connecticut Bankers' Association and the Savings Banks' Association of Connecticut, Defendant-Intervenors.

Civ. No. H 84–1009 (JAC).

United States District Court,
D. Connecticut.

Nov. 15, 1985.

880

Duane C. Quani, Robert C. Johnson, Alan M. Posner, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., Thomas D. Clifford, David Herrman, Skelley, Clifford, Vinkels, Williams and Rottner, P.C., Hartford, Conn., for plaintiffs.

Joseph I. Lieberman, John G. Haines, Peter J. Jenkelunas, Jane Comerford, Office of the Atty. Gen., Hartford, Conn., for defendant.

Allan B. Taylor, Day, Berry & Howard, Hartford, Conn., for defendant-intervenors.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge:

The question presented by this case is whether provisions of a Connecticut statute regulating the banking activities of holding companies and their subsidiaries violate the Commerce Clause or the Supremacy Clause of the United States Constitution. The provisions at issue are Sections 2(b), 2(c) and 2(d) of Connecticut Public Act 84–329 (the "Act") *codified in* C.G.S. § 36–5a(b), (c), (d).[1]

The plaintiffs in this action are Sears, Roebuck and Co. ("Sears"), a New York corporation with its headquarters in Chicago, and five of its financial service subsidiaries. *See* Agreed Statement of Facts (filed Jan. 4, 1985) ("Statement I"), ¶¶ 1–38. These and 12 other of Sears's 264 subsidiaries do business in Connecticut. *Id.* Plaintiff Allstate Enterprises, Inc., which is a wholly owned subsidiary of Sears, wholly owns Sears Savings Bank, which is a California chartered stock thrift institution.[2] *Id.* at ¶ 9. Sears is considered to be a "holding company"[3] under the Act because of its interest in Sears Savings Bank as a wholly owned second-tier subsidiary. *Id.*

1. Section 2 of the Act provides, in pertinent part:

> (b) ... [N]o holding company, no subsidiary of a holding company and no subsidiary or affiliate of a holding company shall establish or maintain an office in this state without the permission of the commissioner.... The commissioner may grant such permission if he determines that such office will not be used to enable such corporation, holding company or subsidiary or affiliate to engage in banking business in Connecticut.... [T]he term "banking business" shall include, without limitation, receiving deposits, paying checks, lending money and any activity which is determined by the banking commissioner to be so closely related to banking as to be a proper incident thereto.
> (c) The provisions of subsection (b) of this section shall not apply to: ... (3) an office of a subsidiary of such bank or association organized under the laws of or having its principal office located in this state, which subsidiary is limited to carrying on one or more of the functions which such bank or association or mutual savings bank or mutual savings and loan association organized under the laws of or having its principal office located in the state may carry on directly in the exercise of its express or implied powers; (4) an office of a holding company or subsidiary of a holding company or subsidiary of a holding company or banking corporation which required and which had received all requisite state and federal authorization and was open for business prior to June 1, 1984, provided that such office may not engage in any activities other than those for which it had authorization and in which it was actually engaged on June 1, 1984; ... or (6) an office established pursuant to subsection (d) of this section.
> (d) Any holding company may establish, either directly or through any subsidiary of such holding company that is not a banking

corporation, and any banking corporation that is not a subsidiary of a holding company may establish, through any of its subsidiaries that are not banking corporations ... not more than two offices in any calendar year for the purpose of engaging in banking business other than to provide deposit services and may maintain such offices in this state subject to the approval of the commissioner. For purposes of this subsection, "deposit services" shall include, without limitation, deposits, withdrawals, advances, payments and transfers of funds to or from a deposit account. Any applicant for permission to establish an office pursuant to this subsection shall pay to the commissioner a fee, in an amount fixed by the commissioner, to defray the costs of processing such applications....

Section 2(e) of the Act provides for penalties for the violation of Section 2(b), (c), (d). *See* C.G.S. § 33–412(a), (d), (e).

In this Ruling, the "Act" refers only to Section 2 of Connecticut Public Act 84–329. This suit does not involve challenges to other provisions of Connecticut Public Act 84–329. *See Northeast Bancorp. v. Board of Governors of the Federal Reserve System,* —— U.S. ——, 106 S.Ct. 2545, 86 L.Ed.2d 112 (U.S.1985) (rejecting constitutional challenge to an interstate bank merger consummated pursuant to provision covered by Section 1 of Connecticut Public Act 84–329).

2. The term "thrift," as used in this Ruling, encompasses savings and loan associations ("savings and loans") and savings banks. Thrifts are, of course, distinct from commercial banks ("banks"). The term "non-bank" denotes an entity engaged in providing certain financial services that is neither a bank nor a thrift.

3. Unless otherwise stated, "holding company" refers either to a thrift holding company, such as Sears, or to a bank holding company.

Howard B. Brown ("defendant") is the Acting Commissioner of the Department of Banking of the State of Connecticut.[4] He succeeded Brian J. Woolf, who issued the determinations at issue in this lawsuit during his tenure as Commissioner of the Banking Department. (The term "Commissioner" refers to both Brown and Woolf during their respective tenures in office.) The defendant-intervenors ("intervenors") are associations of Connecticut banks and thrift institutions, respectively. *See* Affidavit of Preston C. King (filed Nov. 1, 1984) ("King Aff.") and Affidavit of Robert A. Eden (filed Nov. 1, 1984) ("Eden Aff.").

The parties have filed cross-motions for summary judgment and have submitted joint statements of undisputed facts. *See* Statement I; Supplemental Agreed Statement of Facts (filed April 10, 1985) ("Statement II").[5] Oral argument was heard on April 15, 1985. Accordingly, this matter is ripe for decision. The facts as stated in Statement I and Statement II, as well as the exhibits admitted at the hearing, are fully incorporated by reference herein.

## I. *Factual Background*

The undisputed facts show that, since the enactment of the Act,[6] the Commissioner has approved applications by Sears and its various subsidiaries to open 91 offices in Connecticut pursuant to Section 2(b) of the Act. According to the defendant, these applications were approved because the offices with which they were concerned would not be engaging in "banking business." *See* Applications Submitted by Sears, Roebuck and Company and its Subsidiaries under Section 2(b) of Public Act 84–329 (exhibit submitted Apr. 15, 1985 and docketed Aug. 29, 1985); Statement I and Statement II. Sears paid no fee for any of these applications.

Four of Sears's applications have been denied pursuant to Section 2(b) because the Commissioner determined that the proposed offices would engage in banking business. In a letter ruling issued on December 28, 1984, Commissioner Woolf denied applications for two Sears Financial Network Centers ("SNFCs"). *See* Statement I, ¶¶ 11–13 (description of activities of SFNCs). However, the Commissioner expressed a willingness to approve these two applications pursuant to Section 2(d) (which, according to the defendant, allows holding companies to open two banking

---

4. The plaintiffs originally named the State of Connecticut as a defendant. The State moved to dismiss based on the Eleventh Amendment to the United States Constitution. The plaintiffs consented to this dismissal. *See* Certified Official Transcript of Hearing Held on April 15, 1985 (filed Apr. 30, 1985) ("Tr.") at 4.

5. At the commencement of this case and before the Commissioner officially had interpreted or applied the Act to the plaintiffs, the plaintiffs sought a preliminary injunction against the application of the Act to their activities. In anticipation of a preliminary injunction hearing, the court, on October 17, 1984, entered an order providing for expedited discovery and other pretrial proceedings. The plaintiffs subsequently filed a motion for summary judgment. The plaintiffs' motion for preliminary relief was rendered unnecessary by the Commissioner's decision to stay the ruling that would have adversely affected the plaintiffs. *See* Statement II, ¶ 56.

The defendant and intervenors initially filed motions to dismiss the plaintiffs' action. These motions were converted to motions for summary judgment upon the inclusion of factual matters outside the pleadings. *See* Rule 12(b)(6), Fed.R.Civ.P.; Tr. 19–21, 56–57.

6. In 1979, the Connecticut General Assembly imposed a moratorium on the opening of offices in Connecticut of all bank holding companies and their non-bank subsidiaries. *See* Connecticut Public Act 79–563, § 2, *codified in* Conn. Gen.Stat. § 36–5c, *repealed by* Connecticut Public Act 83–411, § 19 (June 8, 1983). At the same time, the state legislature appointed a commission to study the effects of the rapidly changing financial services market and to make legislative recommendations. *See* Connecticut Public Act 79–563, § 1. The Hebb Commission (named for its chairman) issued its report on January 5, 1983. *See* Intervenors' Memorandum of Law in Support of Motion to Dismiss (filed Nov. 20, 1984) ("Intervenors' Memorandum I") at 6–8; Defendant's Memorandum in Support of Motion to Dismiss (filed Oct. 15, 1984) ("Defendant's Memorandum I") at 7–8. Subsequently, the state legislature enacted the predecessor to C.G.S. § 36–5a(b), (c), (d). *See* Connecticut Public Act 83–411, § 9. As of 1983, C.G.S. § 36–5a applied only to bank holding companies. The Act extended Section 36–5a to its current form by bringing thrift holding companies within its scope. Intervenors' Memorandum I at 7–8.

business offices per year in Connecticut) subject to two conditions: First, the SFNCs could not offer "deposit services" (proscribed by Section 2(d)) "including, but not limited to, the deposits in Sears Savings Bank through the 'sweep account' feature of the Dean Witter Active Assets Account...." Statement I, ¶ 52; *see id.,* ¶¶ 32–38 (description of sweep account).[7] Second, Sears would be required to pay a "processing fee" of $1,000 per application pursuant to Section 2(d) of the Act. *See* Statement I, ¶ 52. On January 23, 1985, the Commissioner stayed his ruling on Sears's SFNC applications pending the court's decision in this matter. *See* Statement II, ¶ 56.

On January 17, 1985, Commissioner Woolf denied approval, under Section 2(b) of the Act, for two offices of Allstate Enterprises Mortgage Corporation ("AEMC"), a Sears subsidiary, because he determined that these offices would conduct banking business. In his letter ruling, the Commissioner expressed the opinion that these offices "would fall within the provisions of [Section 2(d) of the Act]." Statement II, ¶ 59. Sears has not since filed an application pursuant to Section 2(d) for the two AEMC offices, presumably because it does not wish to exhaust its yearly limit of two new banking business establishments on these offices. *See* Certified Official Transcript of Hearing Held on April 15, 1985 (filed Apr. 30, 1985) ("Tr.") at 24–25.[8]

The plaintiffs challenge the Act in two general respects. First, they maintain that the provisions of the Act in question violate the Commerce Clause, Art. I § 8, Cl. 3 of the United States Constitution.[9] Second, the plaintiffs contend that the Act, as applied to Sears, is pre-empted by the federal Savings and Loan Holding Company Act, 12 U.S.C. § 1730a, and the Supremacy Clause, Art. VI, Cl. 2 of the United States Constitution.[10]

## II. *Statutory Construction*

Before turning to the merits of the parties' contentions, the court must determine the proper construction of the Act—a statute, it may be noted, that is not a model of clarity.

The plaintiffs offer an interpretation of the Act that is particularly adverse to their own interests and that serves to bolster their position that the Act, on its face, impermissibly discriminates against non-Connecticut holding companies. With the single exception of Section 2(c)(3), which will be discussed later, the plaintiffs' alle-

---

7. The plaintiffs have not specifically challenged the Commissioner's December 28, 1984, ruling concerning the sweep account's provision of deposit services. In fact, the plaintiffs view the portion of the Commissioner's ruling concerning deposit services as *dictum. See* Tr. 28, 37–40. The plaintiffs have restricted their challenge to the December 28, 1984, ruling's interpretation and application of Section 2(b) and of the two-office-per-year limitation of Section 2(d).

8. Based on the actions taken by the Commissioner that have affected, and threaten to affect, the plaintiffs' interests, there can be little doubt that the plaintiffs have alleged the requisite actual injury to support their standing to sue and that this dispute meets the requirements of ripeness. Any previous arguments to the contrary by the defendant and intervenors, *see* Defendant's Memorandum I at 12–14, 20–22; Intervenors' Memorandum I at 9–20, have been overtaken and superseded by the Commissioner's subsequent rulings.

The court also finds the defendant's and intervenors' arguments in support of abstention and dismissal under the doctrine of primary jurisdiction, based upon questions concerning how the Act would be construed, *see* Defendant's Memorandum I at 15–19, 23–26; Intervenors' Memorandum I at 20–25; Section II, *infra,* to be unpersuasive, especially in light of the actions taken by the Commissioner subsequent to the making of these arguments.

The plaintiffs have not argued that the dispute concerning interpretation of the Act, *see* Section II, *infra,* should cause the court to abstain; they maintain that they should prevail in this action under either construction of the Act. *See* note 12, *infra.*

9. The Commerce Clause provides, in pertinent part, that

[t]he Congress shall have Power To regulate Commerce with foreign Nations, and among the several States [.]

10. The Supremacy Clause provides, in pertinent part, that

[t]his Constitution and the Laws of the United States made in Pursuance thereof; ..., shall be the supreme Law of the Land [.]

gations of discrimination and burden on interstate commerce derive from an interpretation of the Act that is directly contrary to the interpretation adopted and applied by the Commissioner. The plaintiffs' interpretation of these provisions is based not on the language of the Act itself but on various statutory definitions enacted prior to the adoption of the Act. *See* Memorandum In Support of Plaintiffs' Motion for Preliminary Injunction (filed Sept. 17, 1984) ("Plaintiffs' Memorandum I") at 7–10, 21–26. In fact, the plaintiffs formulated their interpretation before the Act had been applied to Sears and its subsidiaries. *Id.*

### A.

The plaintiffs contend that the "grandfather" clause of Section 2(c)(4) does not apply to non-Connecticut holding companies such as Sears. *See id.* at 9, 25; Tr. 7–8. The corollary to this contention is that the plaintiffs have to re-establish all of their offices in Connecticut, even if these offices were doing business prior to June 1, 1984. Interestingly, despite the plaintiffs' allegations concerning the discriminatory nature of Section 2(c)(4)'s exemption, they have not made any applications involving offices established before June 1, 1984. *See* Tr. 30. Furthermore, the Commissioner has taken the position that Section 2(c)(4) applies to offices of all holding companies covered by the Act whether or not they are based in Connecticut, *see* Memorandum in Support of Motion to Dismiss (filed Oct. 15, 1984) ("Defendant's Memorandum I") at 3, and he has made no attempt to enforce the Act to the plaintiffs' detriment based on the asserted nonapplicability to the plaintiffs of Section 2(c)(4). *See* Tr. 30.

The plaintiffs also contend that Section 2(d) allows Connecticut holding companies to establish two banking business offices per year but makes no such allowance for non-Connecticut holding companies. *See* Plaintiffs' Memorandum I at 10, 24–26; Tr.

8. According to the plaintiffs, they may not establish any offices in Connecticut to conduct banking business. In contrast to the plaintiffs' view, the Commissioner has taken the position that Section 2(d) applies to non-Connecticut holding companies. *See* Defendant's Memorandum I at 3. The Commissioner already has granted provisional approval pursuant to Section 2(d) for the SFNCs and has offered to do the same for the AEMC offices. *See* Statement I, ¶ 52; Statement II, ¶ 59.

Finally, the plaintiffs maintain that Section 2(b) of the Act requires that a $1,000 fee be paid in connection with applications to open offices in Connecticut that will not engage in banking business. *See* Plaintiffs' Memorandum I at 1, 11, 18, 30. However, Section 2(b), unlike Section 2(d), mentions nothing about an application fee, and the Commissioner has imposed no such fee for the nearly 100 Sears applications that he has approved pursuant to Section 2(b).

### B.

The court, for the purposes of this lawsuit, adopts the Commissioner's interpretation of the Act, absent any application or state court construction to the contrary.[11] *See Kaplan v. Board of Education of the City School District of the City of New York*, 759 F.2d 256, 260 (2d Cir.1985) ("*Kaplan* ") (reliance on relevant agency's interpretation that a statute protects the interests of an adverse party); *Independent Bankers Ass'n v. Marine Midland Bank*, 757 F.2d 453, 461 (2d Cir.1985) (agency's interpretation should be given "considerable respect"); *Cherry v. Lysak*, Ruling on Cross Motions for Summary Judgment, Civ. No. H 80–594 (JAC) (D.Conn. May 24, 1985) at 13–14 [Available on WESTLAW, DCTU database] (deference to administrative agency's interpretation of zoning ordinance procedures absent contrary interpretation from state courts); *Connecticut State Board of Labor Relations v. Board of Education*, 177 Conn. 68,

---

**11.** Assuming *arguendo* that the plaintiffs' interpretation of the Act were correct and that the Commissioner's interpretation and application of the Act depart from the meaning of the Act, the plaintiffs have failed to present a dispute that is ripe for judicial resolution based on their interpretation of the Act.

74, 411 A.2d 28 (1979) ("courts should 'accord great deference to the construction of the agency charged with [the enforcement of the applicable law]'"). *See also Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 37, 100 S.Ct. 2009, 2016, 64 L.Ed.2d 702 (1980) (*"Lewis"*) ("The principal focus of inquiry [in Commerce Clause challenge to state statute] must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects."). Furthermore, the Commissioner's interpretation of the Act appears to be reasonable. *See* Tr. 43–47, 64–66; *Kaplan, supra,* 759 F.2d at 260; *Cherry v. Lysak, supra,* at 13–14.

■ Accordingly, the court adopts the following interpretation of the Act, as enunciated by the Commissioner and applied to the plaintiffs, for purposes of adjudicating the plaintiffs' constitutional challenge to the Act:

A holding company and any of its subsidiaries, whether based in Connecticut or not, must file an application with the Commissioner pursuant to Section 2(b) before opening a non-banking business office in Connecticut. No fee is required for applications filed under Section 2(b).

A holding company and any of its subsidiaries, whether based in Connecticut or not, must file an application pursuant to Section 2(d) if they seek to open an office engaged in "banking business" as defined in Section 2(b). A holding company and its subsidiaries are limited to opening two such offices in Connecticut per year pursuant to Section 2(d). Only applications filed under Section 2(d) must be accompanied by a $1,000 processing fee. Applications under Section 2(d) are not to be approved if the office in question will offer "deposit services" as defined in that Section.

Section 2(c)(4) exempts all offices of subsidiaries of Connecticut and non-Connecticut holding companies from Section 2(b)

and Section 2(d) if the office was open prior to June 1, 1984.

Section 2(c)(3) exempts from Section 2(b) and Section 2(d) only subsidiaries of Connecticut banks and thrifts that are engaged in activities in which their bank and thrift parents are permitted to engage.

### III. *Commerce Clause*

The plaintiffs argue that, for four independent reasons, the Act is invalid under the "dormant" Commerce Clause, which "limits the power of the States to erect barriers against interstate trade" in the absence of Congressional action. *Lewis, supra,* 447 U.S. at 35, 100 S.Ct. at 2015.[12] First, the plaintiffs allege that the Act, on its face and in its intent, impermissibly discriminates against non-Connecticut holding companies and their subsidiaries. *See, e.g., Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 3055–3056, 82 L.Ed.2d 200 (1984) (*"Bacchus"*); *Lewis, supra,* 447 U.S. at 35–37, 100 S.Ct. at 2014–2016; *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); Plaintiffs' Memorandum I at 21–31; Plaintiffs' Reply Memorandum of Law in Support of Their Motion for Summary Judgment (filed Dec. 7, 1984) ("Plaintiffs' Memorandum II") at 3–5; *cf. Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 125–128, 98 S.Ct. 2207, 2213–2215, 57 L.Ed.2d 91 (1978) (*"Exxon"*).

Second, even if the Act does not impermissibly discriminate against non-Connecticut holding companies, the plaintiffs claim that the Act contravenes the Commerce Clause because it imposes a "direct" burden on interstate commerce. *See Edgar v. Mite Corp.,* 457 U.S. 624, 640–643, 102 S.Ct. 2629, 2639–2641, 73 L.Ed.2d 269 (1982)[13]; *Shafer v. Farmers Grain Co.,* 268 U.S. 189, 199–200, 45 S.Ct. 481, 485–486, 69 L.Ed. 909 (1925); Plaintiffs' Memo-

---

**12.** The plaintiffs have attacked the Act not only according to their own interpretation of its provisions but also according to the interpretation and application enunciated by the Commissioner and adopted by the court in Section II, *supra.*

**13.** The portion of Justice White's opinion in *Edgar v. Mite Corp., supra,* that addressed the "direct" burden on interstate commerce was joined by only three of his fellow justices.

randum I at 28–31; Plaintiffs' Memorandum II at 8–9.

Third, the plaintiffs contend that the Act is invalid because it regulates conduct occurring entirely outside Connecticut. *See United Brewers Ass'n v. Healy*, 692 F.2d 275 (2d Cir.1982), *aff'd without opinion*, 464 S.Ct. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983); Plaintiffs' Memorandum I at 31–33; Plaintiffs' Memorandum II at 9–10.

Fourth, the plaintiffs maintain that the Act should be invalidated because it burdens interstate commerce and does not serve a "legitimate local public interest." *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (*"Pike"*); Plaintiffs' Memorandum I at 33–41; Plaintiffs' Memorandum II at 5–7.

The defendant and intervenors argue that the Act does not impermissibly discriminate against non-Connecticut holding companies and that, despite its effect on interstate commerce, the Act involves a proper exercise of the state's police power in an area of legitimate local public concern and therefore does not contravene the Commerce Clause. Memorandum of Defendants State of Connecticut and Brian J. Woolf, Banking Commissioner, in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Motion to Dismiss (filed Nov. 30, 1984) ("Defendant's Memorandum II") at 4–15; Memorandum of Law in Support of Motion to Dismiss (filed Nov. 20, 1984) ("Intervenors' Memorandum I") at 25–31; Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (filed Nov. 30, 1984) ("Intervenors' Memorandum II") at 7–21.

## A. *Discrimination*

■ With the exception of Section 2(c)(3), the provisions of the Act do not discriminate between Connecticut and non-Connecticut holding companies. *See* Section II, *supra*.[14] Therefore, at least with respect to Sections 2(b), 2(c)(4) and 2(d), the Act, unlike the Florida statute invalidated in

*Lewis, supra,* 447 U.S. at 42, 100 S.Ct. at 2018, does not make "out-of-state location" an "explicit barrier." *Id.* at 39, 100 S.Ct. at 2017. *See Exxon, supra*, 437 U.S. at 126, 98 S.Ct. at 2214 ("The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce."); *Lewis, supra,* 447 U.S. at 42, 100 S.Ct. at 2018 (*citing Exxon, supra:* "[D]iscrimination between [similar] interstate and local [firms is] a most critical factor. . . .").

Section 2(c)(3), whose meaning the parties do not dispute, is more problematic because its exemption applies only to so-called "service subsidiaries" of *Connecticut* banks and thrifts and not to similar subsidiaries of other entities. The intervenors and defendant argue that Section 2(c)(3)'s exemption for Connecticut banks and thrifts is not impermissibly discriminatory under the Commerce Clause because it is undisputed that Connecticut may exclude out-of-state banks and thrifts altogether, *see* 12 U.S.C. §§ 1464(r), 1730a(e)(3), 12 C.F.R. § 556.5(a), and because Section 2(c)(3) narrowly limits a service subsidiary's activities to those permitted its Connecticut bank or thrift parent. *See* Intervenors' Memorandum II at 10–12; Defendant's Memorandum II at 12–13; Tr. 67–70.

The plaintiffs concede that Connecticut may exclude non-Connecticut thrifts (such as Sears Savings Bank), and presumably their subsidiaries, from operating in the state. *See* Plaintiffs' Memorandum I at 26; Tr. 40, 87. However, the plaintiffs contend that the service subsidiaries of Connecticut banks and thrifts may open offices without limitation while Sears's subsidiaries are limited by Section 2(b) and Section 2(d). According to the plaintiffs, Sears and similar holding companies are limited in the number of offices (performing activities similar to those of Connecticut service subsidiaries) that they may open in Connecticut merely because they own non-Connecti-

---

**14.** The plaintiffs' arguments on this ground largely are based on their interpretation of the

Act, which the court rejected in Section II, *supra.*

cut banks or thrifts rather than Connecticut banks or thrifts. Plaintiffs' Memorandum I at 22–24; Plaintiffs' Memorandum II at 5; Tr. 25–26, 37.

The plaintiffs' argument is unpersuasive in view of the relevant Supreme Court authorities. There is no dispute that Connecticut, pursuant to applicable federal law, may bar out-of-state banks and thrifts from the state. *See* Plaintiffs' Memorandum I at 26; Tr. 40, 87; *see also Lewis, supra,* 447 U.S. at 44, 100 S.Ct. at 2019 (Congress, consistently with the Commerce Clause, may confer on states the power to regulate interstate commerce). Although the service subsidiaries of Connecticut banks and thrifts covered by Section 2(c)(3) may compete with the non-bank subsidiaries of Sears, such as AEMC, they may do so only to the extent permitted to their parent banks or thrifts.[15] Unlike non-bank subsidiaries of holding companies, the service subsidiaries covered by Section 2(c)(3) are regulated as banks or thrifts along with their parents and, presumably, may not open offices in other states unless permitted to do so by those states and federal law. Such service subsidiaries are alter egos of their bank or thrift parents and therefore are legally and functionally different from non-bank subsidiaries of holding companies.

The fact remains that Section 2(c)(3) does not discriminate against non-bank subsidiaries of non-Connecticut holding companies. As required by *Lewis, supra,* 447 U.S. at 39–42, 100 S.Ct. at 2017–2019, non-bank subsidiaries of Connecticut holding companies *and* non-bank subsidiaries of non-Connecticut holding companies are treated equally by the Act. *See* Tr. 59–61, 66, 75–77. The only geographical discrimination that may exist is between Connecticut banks and trusts (and their service subsidiaries) and their out-of-state counterparts. It is acknowledged by the plaintiffs that a state is permitted to favor the former over the latter even to the extent of excluding all non-Connecticut banks and trusts from the state.[16]

There is no suggestion in the record that Connecticut banks or thrifts are using Section 2(c)(3) to avoid obtaining state approval, pursuant to Section 2(b) and Section 2(d) of the Act, for the establishment of service subsidiaries whose activities exceed those permitted to their bank and thrift parents. In fact, there is evidence suggesting that a Connecticut holding company (presumably for regulatory reasons) has elected to form a non-bank subsidiary to conduct mortgage lending, an activity that the plaintiffs claim could be performed by a service subsidiary. The application for the subsidiary was filed with the Commissioner pursuant to Section 2(d), the same section applied to Sears's similar subsidiary, AEMC. *See* Intervenors' Memorandum II at 9, n. 3.

█ In effect, Section 2(c)(3) imposes a permissible even-handed functional distinction, *see Exxon, supra,* not an impermissible geographic one, *see Lewis, supra,* because of what amounts to a functional difference between local banks and thrifts (and their service subsidiaries) and their out-of-state counterparts. Any competitive advantage of Connecticut holding companies over non-Connecticut holding companies is attributable to the ownership by the former of Connecticut banks or thrifts. This distinction has been sanctioned under the Commerce Clause, as discussed above. Moreover, it remains questionable after *Exxon* whether competitive advantage has any relevance to the discrimination inquiry,

---

15. The plaintiffs have not challenged the validity of Section 2(c)(1), which exempts Connecticut banks and thrifts themselves from the limitations of Section 2(b) and Section 2(d).

16. Any contention by the plaintiffs that the Commissioner's December 28, 1984, ruling is discriminatory because it restricts Dean Witter's sweep accounts as "deposit services" barred by Section 2(d), *see* Tr. 38–39, must be rejected for essentially the same reasons as was the plaintiffs' challenge to Section 2(c)(3). Section 2(d)'s prohibition of deposit services applies even-handedly to non-bank subsidiaries of holding companies. The fact that local banks and thrifts and their service subsidiaries may take deposits, a quintessential legal attribute of banks and thrifts, follows from a state's power to exclude out-of-state banks and thrifts entirely.

especially where that advantage derives from a constitutionally permissible distinction between local and out-of-state entities. In any event, "[a] state regulatory scheme 'is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry.'" *Grocery Manufacturers of America, Inc. v. Gerace*, 755 F.2d 993, 1005 (2d Cir.1985) (rejecting, *inter alia*, Commerce Clause challenge to food labeling statute).

The plaintiffs also argue that, regardless of whether the Act facially discriminates against non-Connecticut holding companies based solely on their out-of-state location, the purpose behind the Act was to effect such discrimination and, for this reason alone, the Act should be invalidated. *See Bacchus, supra*, 104 S.Ct. at 3056; *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 352–353, 97 S.Ct. 2434, 2446–2447, 53 L.Ed.2d 383 (1977); Plaintiffs' Memorandum I at 27–28; Plaintiffs' Memorandum II at 3–4; Tr. 13–15. The plaintiffs rely on the report of the Hebb Commission, *see* note 6, *supra*, and statements of the defendant, *see* Defendant's Memorandum II at 26; Tr. 51–53, to the effect that the Act primarily was aimed at curtailing the activities of a certain kind of multifaceted holding company of which Sears is a typical example. Furthermore, according to the plaintiffs, the purported targets of the Act are all based outside Connecticut. *See* Tr. 12–13.

Furthermore, any arguable legislative intent to burden diversified out-of-state holding companies does not permit an inference of impermissible discrimination because such an intent would be based on the structure of the holding companies rather than their location. As the Supreme Court has observed:

the Commerce Clause [does not] protect[ ] the particular structure or methods of operation in a retail market.... [T]he [Commerce] Clause protects the interstate market, not particular interstate firms from prohibitive or burdensome regulations.

*Exxon, supra*, 437 U.S. at 125–128, 98 S.Ct. at 2213–2215 (upholding state statute that prohibited ownership of local gasoline retailers by oil refining companies, all of which were located out-of-state, but not by other out-of-state businesses).[17]

### B. *Direct Burden*

The plaintiffs argue that the Act also offends the Commerce Clause because it imposes a direct burden on interstate commerce. This burden supposedly results from the extraterritorial effect of the Act on Sears's ownership of Sears Savings Bank and its limitation on the number of offices that Sears and its subsidiaries may open in Connecticut. *See* Plaintiffs' Memorandum I at 28–31; Plaintiffs' Memorandum II at 8–9. This argument lacks merit and requires only brief discussion in view of the holding of *Exxon, supra*, that permitted a state to bar gasoline retailers who were affiliated with out-of-state refiners. The Act clearly imposes less of a direct burden on interstate commerce than did the statute upheld in *Exxon*.

▪ Assuming for the argument that the distinction between direct and indirect burdens on interstate commerce is valid under current law, *see Pike, supra*, 397 U.S. at 142, 90 S.Ct. at 847; L. Tribe, *American Constitutional Law* 326 (1978), the cases cited by the plaintiffs are inapposite because they involved interstate transactions that themselves were the subject of

---

17. Of course, as previously discussed, the Act is even-handed in its language and application. Thus, assuming *arguendo* that the Act's purported purpose was somehow improper, the effects of the Act do not achieve such a purpose. There can be little doubt that the Act would be applied to a holding company of Sears's magnitude if it were based in Connecticut. *See* L. Tribe, *American Constitutional Law* 26 (1979 Supp.), *citing*

*Exxon, supra*, 437 U.S. at 128 & n. 18, 98 S.Ct. at 2215 & n. 18.

This court's finding that the purpose and effect of the Act are not impermissibly discriminatory renders irrelevant any arguable significance of the intervenors' lobbying for and continuing to support the Act against the plaintiffs' challenge. *See* King Aff., ¶ 6; Eden Aff., ¶ 6; Tr. 63, 73–76.

the state statutes. *See Edgar v. Mite Corp., supra,* 457 U.S. at 640–643, 102 S.Ct. at 2639–2641 (four justices invoking "direct" burden on interstate commerce as alternative ground for invalidating state law that regulated nationwide tender offers); *Shafer v. Farmers Grain Co., supra,* 268 U.S. at 199–200, 45 S.Ct. at 485–486 (invalidating statute that predominantly barred interstate transactions if certain conditions were not met). In contrast, the challenged provisions of the Act do not prohibit interstate transaction; they, like the statute upheld in *Exxon, supra,* only limit the opening of certain retail offices in Connecticut by certain kinds of corporations.

## C. *Extraterritorial Effect*

Relying on *United States Brewers Ass'n v. Healy, supra,* 692 F.2d at 279–280, the plaintiffs contend that the Act is unconstitutional, even if it is nondiscriminatory, because it regulates conduct—Sears's ownership of Sears Savings Bank—"occurring wholly outside" Connecticut. The argument is not persuasive.

In *United States Brewers Ass'n v. Healy, supra,* 692 F.2d at 282, our Court of Appeals invalidated a Connecticut law that regulated prices "charged by a non-Connecticut brewer to a non-Connecticut wholesaler in a state outside of Connecticut." [18] It is clear from these facts that *United States Brewers Ass'n v. Healy* has no relevance to the instant case. The statute at issue seeks to regulate even-handedly the conduct of banking business in Connecticut by certain entities rather than to set the prices of transactions in other

states. It makes no attempt to mandate specific conduct outside Connecticut. Any arguable disincentive provided by the Act to the ownership by a holding company of a non-Connecticut bank does not contravene the Commerce Clause because such a disincentive is based on permissible regulation of a certain form of business unit. *See Exxon, supra,* 437 U.S. at 125–128, 98 S.Ct. at 2213–2215; Section III(B), *supra.*

## D. *Balancing*

The plaintiffs' final argument based on the Commerce Clause, *see* Plaintiffs' Memorandum I at 33–41; Plaintiffs' Memorandum II at 5–8, is that the Act, even if it is nondiscriminatory and has only an "incidental" effect on interstate commerce, does not satisfy the balancing test established by *Pike, supra,* 397 U.S. at 142, 90 S.Ct. at 847:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*See Grocery Manufacturers of America, Inc. v. Gerace, supra,* 755 F.2d at 1003–1005 (applying *Pike* test).[19]

---

**18.** Our Court of Appeals held that Connecticut permissibly could have achieved a similar result by requiring that Connecticut prices be no higher than prices in other states as opposed to requiring that prices elsewhere be no lower than those in Connecticut. *United States Brewers Ass'n, supra,* 692 F.2d at 283–284. In this case, the Act clearly satisfies the requirements of *United States Brewers Ass'n* because it focuses on activities conducted in Connecticut.

**19.** In upholding the challenged statute in *Exxon, supra,* the Supreme Court did not even apply

*Pike*'s balancing test. Thus, if *Exxon, supra,* were found to control the instant case, this step of the analysis would be superfluous.

On the other hand, in *Lewis, supra,* 447 U.S. at 42–44, 100 S.Ct. at 2018–2020, where geographic discrimination was found to exist, the Supreme Court applied the balancing test rather than a *per se* rule. Thus, even if this case were to be viewed as closer to *Lewis* than to *Exxon,* in contrast to the court's holding in Section III(A), *supra,* a balancing test would be appropriate.

"[B]anking and related financial activities are of profound local concern." *Lewis, supra,* 447 U.S. at 38, 100 S.Ct. at 2016. A state has an interest in "sound financial institutions and honest practices" and, although banking has strong interstate attributes, there is a long history of state regulation of banking. *Id.* at 38–39, 100 S.Ct. at 2016–2017. *See Florida Department of Banking and Finance v. Board of Governors of the Federal Reserve System,* 760 F.2d 1135, 1141 (11th Cir.1985) (noting "the traditional Congressional concern that banking be subject to the local goals and policies of the states").

According to the intervenors and defendant, the Act advances the purpose of measured growth in the number of non-bank subsidiaries of holding companies that engage in banking business. *See* Intervenors' Memorandum II at 16–18; Defendant's Memorandum I at 4–7; Tr. 59, 63, 75–77. They maintain that holding companies were singled out for regulation because they otherwise might make use of their non-bank subsidiaries to circumvent the extensive state regulation of their bank and thrift subsidiaries. *See* Tr. 75–79. Therefore, the intervenors and defendant contend that Section 2(d)'s limitation of holding companies to the opening of two banking business offices per year with an attendant $1,000 fee per application and Section 2(b)'s filing requirements for every subsidiary are not "clearly excessive in relation to the putative local benefits" and that the alternatives would not be less burdensome to interstate commerce. *See* Intervenors' Memorandum II at 19–21.

■ The court finds that Connecticut's interest in the stable growth of its financial sector in a rapidly changing market environment, *see Independent Bankers Ass'n v. Marine Midland Bank, supra,* 757 F.2d at 459–460, is substantial and that the Act is an even-handed, reasonable and moderate attempt to promote this interest. The Act's focus on holding companies rather than on all financial entities is grounded in the reasonable belief that holding companies are a particularly appropriate target for regulation because of their links to banks and thrifts. *See Exxon, supra* (upholding total ban on gas retailers with ownership ties to refiners); *cf. Lewis, supra,* 447 U.S. at 42–44, 100 S.Ct. at 2018–2020 (invalidating non-even-handed statute, involving a total ban, where focus on out-of-state holding companies was not supported by the state's justification for the statute). In this case, in contrast to *Lewis, supra,* 447 U.S. at 43, 100 S.Ct. at 2019, the Act provides for an even-handed yearly limit, as opposed to an outright ban, on offices engaged in banking business and Connecticut's interest justifies the singling out of holding companies.

The plaintiffs argue that Connecticut ought to have pursued this interest not through the Act but instead through conventional regulation or application of the Act's restrictions to all financial firms. *See* Plaintiffs' Memorandum I at 40–41. Such arguments are more appropriately addressed to the state legislature than to the court. Connecticut, although it could have chosen either means suggested by the plaintiffs, was not obligated to do so. In fact, the state reasonably could have concluded that conventional regulation would have been less effective than the Act in effectuating the state's legitimate and substantial interest and that restrictions on all financial firms would have been unnecessarily burdensome to interstate commerce. *See Pike, supra,* 397 U.S. at 142, 90 S.Ct. at 847. The plaintiffs' arguments " 'relate[ ] to the wisdom of the statute, not to its burden on commerce.' ... That wisdom is better reconsidered in [the state capitol] than [the courthouse]." *Grocery Manufacturers of America, Inc. v. Gerace, supra,* 755 F.2d at 1005 (applying *Pike* balancing test in upholding a food labeling scheme), *quoting Exxon, supra,* 437 U.S. at 128, 98 S.Ct. at 2215.

In sum, because the Act satisfies the balancing test set forth in *Pike* and because it does not offend the Commerce Clause in any other respect, the plaintiffs' Commerce Clause claim must fail.

## IV. Supremacy Clause/Pre-emption

The plaintiffs make two arguments under the Supremacy Clause. First, they argue that the Act's regulation of thrift holding companies is implicitly pre-empted by the federal Savings and Loan Holding Company Act ("SLHCA"), 12 U.S.C. § 1730a(a)–(n), because Congress has "occupied the field" of regulation.[20] See Plaintiffs' Memorandum I at 43–45; Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) (finding of implicit pre-emption is appropriate where "the scheme of federal legislation [is] so pervasive as to make reasonable the inference that Congress left no room for the state to supplement it"); Fidelity Federal Savings and Loan Association v. de la Cuesta, 458 U.S. 141, 152–153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (discussion of pre-emption standard); Grocery Manufacturers of America, Inc. v. Gerace, supra, 755 F.2d at 999 (same). Second, the plaintiffs claim that the Act directly conflicts with one of the purposes of SLCHA, which was to protect the marketability of savings and loan holding companies, such as Sears, that own only one thrift institution ("unitary holding companies"). See Plaintiffs' Memorandum I at 45–48; Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (pre-emption appropriate where state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

### A.

In support of their thesis that SLHCA pre-empts state regulation of thrift holding companies, the plaintiffs note that the legislative history of SLHCA refers to it as "a comprehensive statutory framework" for the regulation of unitary holding companies and savings and loan holding companies that own more than one thrift ("multi-ple holding companies"). See H.Rep. No. 997, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Ad.News 1601, 1603 (1968); Plaintiffs' Memorandum I at 41–43.

The defendant and intervenors contend that SLCHA evinces no intent, implicit or explicit, to pre-empt the Act. See Defendant's Memorandum II at 18–24; Intervenors' Memorandum I at 32–34; Hayfield Northern Railroad Company, Inc. v. Chicago and North Western Transportation Company, 467 U.S. 622, 104 S.Ct. 2610, 2617, 81 L.Ed.2d 527 (1984) ("Hayfield") (pre-emption of "a field of commerce" is inappropriate unless "the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."), quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963); Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at 230, 67 S.Ct. at 1152 (pre-emption inappropriate in an area in which states historically have regulated absent "clear and manifest purpose of Congress"); Exxon, supra, 437 U.S. at 132, 98 S.Ct. at 2217 ("This Court is generally reluctant to infer pre-emption ... and it would be particularly inappropriate to do so [where] the basic purposes of the state statute and [the federal statute] are similar."). In addition, the intervenors note (1) that Congress, when it enacted SLHCA, was aware that California had in effect a regulatory scheme for thrift holding companies and nothing in SLHCA or its legislative history manifested an attempt to displace such a scheme, and (2) that a provision in SLHCA, 12 U.S.C. § 1730a(b)(4), provides for sharing of information between federal regulators of thrift holding companies and state authorities, thereby suggesting that there still was something for the states to regulate. See Intervenors' Memorandum I at 33–34.[21]

---

20. The plaintiffs do not argue that SLHCA explicitly pre-empts the Act.

21. The plaintiffs' counterargument to the facts noted by the intervenors, see Plaintiffs' Memorandum II at 12–13, are unconvincing. First,

the existence of the California regulatory scheme at the time SLHCA was enacted undercuts the plaintiffs' argument that SLHCA's "comprehensive statutory framework" was intended exclusively to occupy the field of regulation of thrift holding companies, although it may not

■ The court finds that the mere description of the SLHCA as "a comprehensive regulatory framework" in a legislative report does not constitute the requisite "clear and manifest purpose of Congress" and does not indicate that Congress unmistakably ordained pre-emption of state regulation of thrift holding companies.[22] See, e.g., *Rice v. Santa Fe Elevator Corp.,* supra, 331 U.S. at 230, 67 S.Ct. at 1152; *Hayfield, supra,* 104 S.Ct. at 2617; *see also De Canas v. Bica,* 424 U.S. 351, 359–360, 96 S.Ct. 933, 938–939, 47 L.Ed.2d 43 (1976) ("comprehensiveness" of legislative scheme, by itself, is insufficient for inference of pre-emption); *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 414–415, 93 S.Ct. 2507, 2513–2514, 37 L.Ed.2d 688 (1973) (same); *Head v. New Mexico Board of Examiners in Optometry,* 374 U.S. 424, 429–430, 83 S.Ct. 1759, 1762–1763, 10 L.Ed.2d 983 (1963) (same). The plaintiffs do not contend, and indeed could not contend, *see* Section III(D), *supra; Lewis, supra,* 447 U.S. at 38, 100 S.Ct. at 2016, that "the nature of the . . . subject matter [regulated by the

Act] permits no other conclusion [than that pre-emption was the intended result of the SLHCA]." *Hayfield, supra,* 104 S.Ct. at 2617.[23]

## B.

According to the plaintiffs, the limits placed only on subsidiaries of multiple holding companies by SLHCA, 12 U.S.C. § 1730a(c)(2), evince a congressional intent to pre-empt state regulation of subsidiaries of unitary holding companies.[24] As the plaintiffs themselves note, however, *see* Plaintiffs' Memorandum I at 45–46, Congress's desire was to protect the marketability of thrifts owned by unitary holding companies by not limiting the *"unrelated activities"* in which they were permitted to engage. In contrast, Congress did not hesitate to regulate the unrelated activities of multiple holding companies under the same statute. The defendant and intervenors argue that the relevant provisions of the Act, because they regulate only banking business subsidiaries, do not conflict with the arguable congressional intent underlying

be relevant to the issue of regulation of non-bank subsidiaries of such holding companies, which were not specifically regulated by California. Second, the holding of *Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 232, 67 S.Ct. at 1153, that federal statutory provisions requiring the sharing of information between federal and state regulators did not preclude pre-emption does not compel a different result here because the facts of that case are inapposite, *see* note 23, *infra;* moreover, that case specifically noted that, in different circumstances, similar to those in this case, where the pre-emptive intent of Congress was less obvious, the existence of an information-sharing provision would be a strong argument against implicit pre-emption. *See Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 232, 67 S.Ct. at 1153.

**22.** Similarly, the fact that Congress did not include a provision in SLHCA similar to Section 7 of the earlier-enacted Bank Holding Company Act, 12 U.S.C. § 1846, permitting state regulation of savings and loan holding companies, *see* Plaintiffs' Memorandum II at 13–14, is not sufficient to suggest that Congress, in enacting SLHCA, intended to pre-empt state law.

**23.** The facts and holding of *Rice v. Santa Fe Elevator Corp., supra,* the case exclusively relied upon by the plaintiffs, are inapposite to this

case. In that case, the Supreme Court stressed that the language of the federal statute itself explicitly provided for "exclusive" federal "jurisdiction," *see id.* at 224, 229, 233, 67 S.Ct. at 1148, 1151, 1153, and that the detailed and "unambiguous" legislative history made clear that federal law was meant to prevail and that the prior system of dual regulation was to be terminated. *See id.* at 233–236, 67 S.Ct. at 1153–1155. The plaintiffs have not brought to the court's attention statutory language or legislative history approaching the strength and clarity of that present in *Rice v. Santa Fe Elevator Corp., supra.* That case more properly may be viewed as involving explicit rather than implicit pre-emption. *See* Tribe, *American Constitutional Law, supra,* at 386. In any event, more recent Supreme Court cases, *see, e.g., Hayfield, supra,* 104 S.Ct. at 2617, employ a stricter standard for the finding of implicit pre-emption than did *Rice v. Santa Fe Elevator Corp.*

**24.** The plaintiffs do not claim that it is impossible to comply with the terms of both the Act and SLHCA. *See Florida Lime & Avocado Growers, Inc. v. Paul, supra,* 373 U.S. at 142–143, 83 S.Ct. at 1217–1218.

SLHCA.[25] *See* Intervenors' Memorandum I at 36–37; Defendant's Memorandum II at 27.

 The defendant and intervenors correctly note that no inconsistency exists between this asserted congressional purpose and the Act's limitation on banking business subsidiaries to the opening of two offices per year. The Act does not attempt to limit Sears's subsidiaries to the list of activities permitted to subsidiaries of multiple holding companies by the federal statute. The plaintiffs have failed to offer any evidence that Congress, in making Section 1730a(c)(2) applicable only to multiple holding companies, intended that the various banking business subsidiaries of large, far-flung unitary holding companies would be exempt from any limitations imposed by the states. Furthermore, there is no suggestion that Congress contemplated the protection of the marketability of a thrift institution, such as Sears Savings Bank, that is a small part of a huge retail and financial network. In any event, the Act's limitations have at most a modest impact on marketability. *See* Section III(D), *supra.*

In sum, the court cannot conclude that the Act "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz, supra,* 312 U.S. at 67, 61 S.Ct. at 404. Accordingly, the Act is not pre-empted by the federal SLHCA and the plaintiffs' challenge pursuant to the Supremacy Clause must fail.

### Conclusion

For the reasons stated above, the court finds that the Act violates neither the Commerce Clause nor the Supremacy Clause. Accordingly, the plaintiffs' motion for summary judgment is denied, and the defendant's and intervenors' motions for summary judgment are granted. Judgment for

the defendant and intervenors shall enter forthwith.

It is so ordered.

---

**25.** The plaintiffs do not contend that Section 2(b)'s *de minimis* registration requirement for all holding company subsidiaries impermissibly conflicts with the purposes underlying Section 1730a(c)(2).